UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                       :

JUSTIN GRAHAM, on behalf of himself and  :
all others similarly situated,                          :
                                       :

                           Plaintiff,    :             22-CV-7015 (VSB)
                                       :

              - against -          :            **OPINION & ORDER**
                                       :
                                       :

BLOOMBERG L.P.,                         :
                                       :
                      Defendant.  :
                                       :
------------------------------------------------------X

<u>Appearances</u>:

Victoria Jennings Maniatis
Milberg Coleman Bryson Phillips Grossman PLLC
Garden City, New York

Joshua David Arisohn
Bursor & Fisher, P.A
New York, New York
*Counsel for Plaintiff*

Adya Baker
Jeffrey Landis
ZwillGen PLLC
Washington, DC
*Counsel for Defendant*

<u>VERNON S. BRODERICK, United States District Judge</u>:

       Defendant Bloomberg L.P. ("Bloomberg") moves to dismiss the complaint in this action

and compel Plaintiff Justin Graham ("Graham") to participate in arbitration.  (Doc. 8.)  Because I

find the arbitration agreement between Bloomberg and Graham to be valid and that the better

practice is to stay this proceeding rather than dismiss it, Bloomberg's motion is GRANTED IN

PART and DENIED IN PART.  The case is STAYED pending the outcome of arbitration.

## I.      <u>Factual Background</u>[1]

On February 16, 2021, Graham purchased a subscription to Bloomberg's news service. (Doc. 10 ¶¶ 2, 5.)  To do so, Graham navigated to Bloomberg's online subscription page.  (*Id.* ¶ 7.)  The page, as it existed on the day Graham visited it, is reproduced below.



(Doc. 22 ¶ 8; Doc. 22-1 at 2.)  On this screen was a line stating "By submitting my information, I agree to the <u>Privacy Policy</u> and <u>Terms of Service</u> and to receive offers and promotions from Bloomberg."  (Doc. 22-1 at 2.)  Each of the underlined terms, when clicked on, linked to different webpages—the "Terms of Service" text linked to a page containing Bloomberg's terms of service.  (Doc. 10 ¶¶ 8, 11.)

---

[1] The following facts are taken from Graham's complaint, (Doc. 1), or the papers filed by the parties as part of Bloomberg's motion to compel, (Docs. 8–10, 15–17, 21–22).  On a motion to compel, a court follows a standard similar to that for summary judgment.  *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49 (2d Cir. 2022).  Accordingly, facts in this section are uncontested unless otherwise noted.

The "Terms of Service" webpage (the "Terms of Service Page") includes the following text in the first paragraph:

> PLEASE READ ALL OF THE FOLLOWING TERMS AND CONDITIONS OF SERVICE FOR THIS WEB SITE ("TOS") BEFORE USING THIS SITE. By continuing to access, link to, or use this site, or any service on this site, you signify YOUR ACCEPTANCE OF THE TOS, INCLUDING WITHOUT LIMITATION, THE ARBITRATION AGREEMENT AND CLASS ACTION WAIVER DESCRIBED IN PARAGRAPH 14 BELOW.

(Doc. 10 ¶ 12; Doc. 10-2 at 1.)  Paragraph 14 of the Terms of Service Page sets out the agreement to arbitrate (the "Arbitration Agreement") which provides, in relevant part, that:

> By using this site in any way, you unconditionally consent and agree that:  (1) any claim, dispute, or controversy (whether in contract, tort, or otherwise) you may have against Bloomberg and/or its parent, subsidiaries, affiliates and each of their respective current or former members, officers, directors and employees (all such individuals and entities collectively referred to herein as the "Bloomberg Entities") arising out of, relating to, or connected in any way with the website or the determination of the scope or applicability of this agreement to arbitrate, will be resolved exclusively by final and binding arbitration administered by JAMS and conducted before a sole arbitrator in accordance with the rules of JAMS; (2) this arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16; . . .

(Doc. 10-2 at ¶ 14.)  The same section further provides that "there shall be no authority for any claims to be arbitrated on a class or representative basis."  (*Id.*)  Graham did not know about the Arbitration Agreement when he signed up for Bloomberg's services.  (Doc. 17 ¶ 3.)

**II.    Procedural History**

Graham filed a class action complaint on August 17, 2022, alleging violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710.  (Doc. 1.)  Bloomberg promptly waived service.  (Doc. 8.)  On October 18, 2022, Bloomberg moved to compel Graham to arbitrate his claims on an individual basis and dismiss the complaint.  (Doc. 8.)  In support, it submitted a memorandum of law, (Doc. 9), and the declaration of Marissa Zanetti-Crume ("Zanetti-Crume")

with supporting exhibits, (Doc. 10).  Graham opposed the motion on November 22, 2022, (Doc. 15), and submitted the declarations from Philip L. Fraietta, (Doc. 16), and Graham, (Doc. 17), in support.  The motion was fully briefed on December 13, 2022, when Bloomberg filed its reply, (Doc. 21), and a further declaration from Zanetti-Crume with supporting exhibits, (Doc. 22).

### III.    **Legal Standard**

Under the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  Where a party moves to compel arbitration pursuant to such an agreement, "the court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.  Thus, when a court is requested to enforce an agreement to arbitrate, "the district court must first determine whether such agreement exists between the parties." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017).  "This question is determined by state contract law."  *Id.* at 73–74.  "If the district court concludes that an agreement to arbitrate exists, it should then consider whether the dispute falls within the scope of the arbitration agreement."  *Id.* at 74 (internal quotation marks omitted).  "Where parties are bound to an arbitration agreement, courts are instructed to favor arbitration as a form of dispute resolution." *Barrows*, 36 F.4th at 50.  "But on the antecedent question of whether the parties actually agreed to arbitration (that is, whether an arbitration agreement between them exists at all), [a court] show[s] no such special solicitude."  *Id.*

"Motions to compel arbitration are governed by a standard similar to that applicable for a motion for summary judgment."  *Id.* at 49 (cleaned up).  In considering such a motion, a "court

considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Meyer*, 868 F.3d at 74 (cleaned up).  In the context of a motion to compel arbitration, new evidence may be submitted and considered in the reply if that evidence is submitted in response to new material issues raised in opposition papers.  *See Yorke v. TSE Grp. LLC*, No. 18-CV-5268 (JMF), 2019 WL 3219384, at *2 (S.D.N.Y. July 17, 2019) (collecting cases).

"When a district court grants an application to enforce an arbitration clause, there is a question as to whether Section 3 of the FAA requires that a stay be entered." *Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655, 663–64 (2d Cir. 2022) (Jacobs, J., concurring). "Courts across the Circuits are divided on this question; some hold that a stay is mandatory, and others hold that a district court may dismiss the case." *Id.*  Although the "structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested," *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015), "courts in this Circuit are split on whether a stay is required even if no party requests one." *Bissonnette*, 49 F.4th at 664 (Jacobs, J., concurring).  "There is no question, however, that the Court has discretion to impose a stay pursuant to its 'inherent authority to manage [its] docket[ ].'" *Monk v. Goldman Sachs & Co. LLC*, No. 22-CV-6056 (JMF), 2023 WL 22618, at *7 (S.D.N.Y. Jan. 3, 2023) (quoting *Katz*, 794 F.3d at 346) (alterations in original).

IV.   **Discussion**

A.   *Arbitrability of the Dispute*

Graham does not contest that the present dispute falls within the scope of the Arbitration

Agreement.  (*See generally* Doc. 15.)  Additionally, neither party disputes that New York law governs the interpretation of whether a valid arbitration agreement exists between parties.  (*See* Doc. 9 at 6 n.2; Doc. 15 at 4.)  Therefore, the only question before me is whether the Arbitration Agreement between Graham and Bloomberg is valid.  Both parties agree that this question turns on whether Graham agreed to the Arbitration Agreement, (*compare* Doc. 9 at 7 *with* Doc. 15 at 3), given that "[i]t is a basic tenet of [New York] contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'"  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (citing *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050 (N.Y. 1999)).  In making this determination, I consider the parties' moving papers, (Docs. 9, 15, 21), and the declarations they submitted in support of those papers.  (Docs. 10, 16, 17, 22.)[2]

The parties do not contest that Graham lacked actual knowledge of the Arbitration Agreement.  (Doc. 17 ¶ 3.)  Thus, "in cases such as this, where the purported assent is largely passive, the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the term at issue."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012).  "In other words, where there is no actual notice of the term, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent."  *Id.*[3]

---

[2] As noted, I may consider new evidence such as the declaration at Doc. 22, submitted in response to new material issues raised in Graham's opposition motion.  *Yorke*, 2019 WL 3219384, at *2.  Graham, in any case, did not seek to oppose the submission of that declaration through a sur-reply.  (Doc. 21 at 2 n.1.)

[3] In addition to "actual notice" and "inquiry notice," courts sometimes discuss this issue in terms of "constructive notice."  Constructive notice generally refers to "[n]otice arising by presumption of law from the existence of facts and circumstances that a party had a duty to take notice of, such as a registered deed or a pending lawsuit; notice presumed by law to have been acquired by a person and thus imputed to that person."  Notice, Black's Law Dictionary (11th ed. 2019).  Thus, for example, "to constitute constructive notice," in certain negligence cases, New York law provides that "a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it."  *Gordon v. Am. Museum of Nat. Hist.*, 492 N.E.2d 774, 775 (N.Y. 1986).  Practically, this may frequently overlap with the concept of "inquiry notice," which

Graham does not suggest that if he was on inquiry notice of the Arbitration Agreement, his conduct would not constitute assent. (*See* Doc. 15 at 6–10.) Moreover, this argument would be unavailing. Where a party is on inquiry notice that clicking a button in a website's interface binds them to contractual terms set out by that website, clicking that button manifests assent. *See Meyer*, 868 F.3d at 79–80 ("A reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not."); *see also Maldonado v. Nat'l Football League*, No. 1:22-CV-02289 (ALC), 2023 WL 4580417, at *3 (S.D.N.Y. July 18, 2023) ("[B]y clicking the 'Complete Order' or 'Create An Account' buttons, each Plaintiff accepted the contract terms and entered into an agreement with Defendants."); *Nicholas v. Wayfair Inc.*, 410 F. Supp. 3d 448, 453 (E.D.N.Y. 2019) ("Plaintiff voluntarily acceded to the terms of use. She is a sophisticated individual. When placing an order for the headboard, she clicked 'Submit Order,' immediately under which was the text 'By placing this order, you are agreeing to our terms and conditions[.]'") (alterations in original). The question of whether Graham agreed to the Arbitration Agreement turns solely on whether he was on inquiry notice of its terms.

"In the context of web-based contracts, [courts] look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in way that would put her on inquiry notice of such terms." *Starke*, 913 F.3d at 289. In making this determination, the Court of Appeals has identified numerous design attributes that may inform

---

describes "notice attributed to a person when the information would lead an ordinarily prudent person to investigate the matter further." Notice, Black's Law Dictionary (11th ed. 2019); *see also Meyer*, 868 F.3d at 74–75 (an "offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms.") Given that these concepts both frequently turn on what a person ought to have known in a given scenario, they are understandably referenced somewhat interchangeably in the context of web browser or mobile phone-based contracts. *See, e.g.*, *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) (discussing constructive and inquiry notice in comparable terms). For simplicity, I discuss the matter here in terms of inquiry notice, which aligns most closely with the governing standard of what an ordinarily prudent person would discover, rather than constructive notice, which turns on specific, legally-defined scenarios in which knowledge is imputed to a person.

this determination:

- Whether information on the relevant terms is conspicuous in light of the whole web page, particularly given the use of various colors and fonts;

- Whether the language used was a clear indication that a user should read the terms and conditions and that a given act would signal asset to those terms;

- Whether the relevant screen is cluttered with additional information, buttons, unrelated offers, and promotional material or conversely, whether it includes only a few items such as fields for credit card details, registration information, and the relevant language alerting a user to the contract at issue;

- Whether the entire screen, including the contractual notice or terms of service link is visible at once without need for a user to scroll beyond what is immediately visible; and

- Whether the button for the relevant transaction is coupled with the link to the terms of service such that the customer is notified of the terms of service at the time of sale.

*Id.* at 290–92 (citing *Nicosia*, 834 F.3d at 233–238, and *Meyer*, 868 F.3d at 78–82).  Based on these criteria, the layout employed in *Meyer*, 868 F.3d at 79, was found to be sufficient to put a user on inquiry notice, but the layout in *Nicosia*, 834 F.3d at 238, was unclear enough that a determination on the issue of notice by a fact-finder was required.  For ease of reference and comparison, the screens the Court of Appeals analyzed in each case are reproduced below as they appear in *Starke*, 913 F.3d at 290–91.  The relevant Bloomberg screen is reproduced below these.  (Doc. 22-1 at 2.)



*Meyer*                                                      *Nicosia*



Bloomberg

Judged against these precedents, the "design and content" of Bloomberg's interface is such that "the contract terms were presented to the offeree in way that would put [Graham] on inquiry notice of such terms." *Starke*, 913 F.3d at 289.  As in *Meyer,* Bloomberg's "entire screen is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service."  868 F.3d at 78.  *See also Wilson v. Triller, Inc.*, 598 F. Supp. 3d

82, 95 (S.D.N.Y. 2022) (terms were sufficiently conspicuous where "the entire screen was visible at once, without there being a need to scroll beyond the page to find the terms.")  The notice is thus "spatially coupled with the mechanism for manifesting assent," here, the "Purchase Subscription" button at the bottom of Bloomberg's screen.  This notice is also "temporally coupled" with the mechanism for manifesting assent because the terms and conditions are provided together.  (Doc. 22-1 at 2.)  The spatial and temporal connection between the contract terms and the means for assenting to them weigh in favor of finding that Graham was on inquiry notice.  *Meyer*, 868 F.3d at 78; *see also Peni v. Daily Harvest, Inc.*, No. 22CV5443 (DLC), 2022 WL 16849451, at *4 (S.D.N.Y. Nov. 10, 2022) (user was put on inquiry notice where terms of use, including an arbitration provision, were temporally and spatially coupled with the mechanism for manifesting assent).

The language alerting a user to the Arbitration Agreement is a clear prompt to read the terms and conditions and signals to a user that purchase will bind them to those terms.  (*Compare* (Doc. 22-1 at 2) ("By submitting my information, I agree to the <u>Privacy Policy</u> and <u>Terms of Service</u> and to receive offers and promotions from Bloomberg,") *with Meyer*, 868 F.3d at 79 ("[T]he language '[b]y creating an Uber account, you agree' is a clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms.") (second alteration in original)).

The Terms of Service Page prominently highlights the Arbitration Agreement.  The first paragraph on the Terms of Service Page states the existence of the Arbitration Agreement in capital letters and directs the reader to the precise, separately-headered section setting out the Arbitration Agreement.  (Doc. 10-2 at 1, 14–15.)  This weighs in favor of finding the user was on inquiry notice.  *See, e.g.*, *Peiran Zheng v. Live Auctioneers LLC*, No. 20-CV-9744 (JGK), 2021

WL 2043562, at *5 (S.D.N.Y. May 21, 2021) ("The arbitration provision itself was not hidden in the Terms & Conditions.  Rather, it was given its own section with a bolded and numbered heading entitled 'Arbitration.'")

Finally, the font, color, and overall design of the Bloomberg page helped to put Graham on inquiry notice.  The text hyperlink directing a user to Bloomberg's Terms of Service Page is underlined and in black text on a white background.  Although this text is not written in a font as large as the page headers, it is in a font size comparable to numerous other text items on that screen such as billing and subscription information.  (Doc. 22-1 at 2.)  The font size and use of underlining helps put a user on inquiry notice.  *See, e.g.*, *Meyer*, 868 F.3d at 78 ("Although the sentence is in a small font, the dark print contrasts with the bright white background, and the hyperlinks are in blue and underlined."); *Peni*, 2022 WL 16849451, at *4 ("The dark text presenting the warning is set off from the light background and is written in a font roughly the same size as that of the primary text on the page."); *Hidalgo v. Amateur Athletic Union of United States, Inc.*, 468 F. Supp. 3d 646, 651, 655 (S.D.N.Y. 2020) (noting, with approval that the relevant terms and conditions link was underlined); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 552 (S.D.N.Y. 2018) (finding a user was on notice where, among other factors "'Terms of Service' was highlighted with blue font and an underline, indicating a hyperlink that took users directly to the TOS."); *Wanless v. Peloton Interactive, Inc.*, No. 2:23-CV-00405-DMC, 2023 WL 4086455, at *6 (E.D. Cal. June 20, 2023) (noting with approval that "[t]he phrases 'Terms of Service,' 'Privacy Policy,' and 'Membership Terms' are called out in underline and hyperlink such that the documents can be downloaded for review.")

There are few conflicting colors on Bloomberg's page, as the scheme is basically black, white, and grey, with a single purple bar indicating where to purchase.  (Doc. 22-1 at 2.)  This

aligns with design schemes approved by other courts.  *See, e.g.*, *Hidalgo*, 468 F. Supp. 3d at 657
(*"*The relevant text in the 'terms and conditions' box . . . clearly draws a reasonable user's
attention to it because of the blue hyperlinks, the red asterisks, the normal font size, and the clear
contrast between the mostly black text and the yellow background."); *Peter v. DoorDash, Inc.*,
445 F. Supp. 3d 580, 586 (N.D. Cal. 2020) ("DoorDash's sign-up page looks markedly similar to
the page approved by *Meyer*.  The screens are similarly uncluttered and wholly visible . . .
Despite Plaintiff's characterization of the font as gray-on-gray, the text contrasts clearly with the
background and is plainly readable." (citing *Meyer*, 868 F.3d at 81)); *Peiran Zheng*, 2021 WL
2043562, at *5 ("The 'AGREE' button was a distinctive orange color that stood out on the page.
The Terms & Conditions, Privacy Policy, and Cookie Policy were capitalized, blue, and
underlined, clearly indicating to a reasonably prudent internet user that those terms were
hyperlinked.")

In terms of overall design and clutter or lack thereof, Bloomberg's page contains only the
identification and payment information necessary to purchase a subscription without any
additional offers or advisements.  (Doc. 22-1 at 2.)  *Compare Meyer*, 868 F.3d at 78 ("The
Payment Screen is uncluttered, with only fields for the user to enter his or her credit card details,
buttons to register for a user account or to connect the user's pre-existing PayPal account or
Google Wallet to the Uber account, and the warning that 'By creating an Uber account, you
agree to the TERMS OF SERVICE & PRIVACY POLICY.'") *with Nicosia*, 834 F.3d at 237
("[T]here appear to be between fifteen and twenty-five links on the Order Page, and various text
is displayed in at least four font sizes and six colors (blue, yellow, green, red, orange, and black),
alongside multiple buttons and promotional advertisements.").  In sum, the design of
Bloomberg's page put Graham on inquiry notice that by purchasing a subscription to Bloomberg,

he validly assented to the Arbitration Agreement.

### B.  *Stay or Dismissal of the Action*

Having determined that Graham assented to the Arbitration Agreement, I must determine whether the action should be dismissed, as Bloomberg requests, or stayed.  Had Graham requested a stay, it would be mandatory pursuant to *Katz*, 794 F.3d at 347.  However, nowhere in Graham's papers is such a stay requested.  (*See generally* Doc. 15.)  Despite this, I need not reach the question of whether a stay is mandatory notwithstanding the lack of a request as I have the discretion to stay the action.  *Monk*, 2023 WL 22618, at \*7.  Moreover, although courts have split on the question of whether to stay or dismiss an action where a motion to compel arbitration is granted, *see, e.g.*, *Cadia Cap. Advisors LLC v. Fagu LLC*, No. 22 CIV. 5847 (VM), 2022 WL 4538347, at \*5 (S.D.N.Y. Sept. 28, 2022) (dismissing a case pending the outcome of arbitration), after *Bissonnette*, 49 F.4th 655, they have increasingly exercised their discretion to stay a matter pending the resolution of arbitration, *see, e.g.*, *Monk*, 2023 WL 22618, at \*7; *EX.CO Tehnologies Ltd. v. Empire Media Grp. Inc.*, No. 1:22-CV-06383 (MKV), 2023 WL 5035175, at \*3 (S.D.N.Y. Aug. 8, 2023); *Yost v. Everyrealm, Inc.*, No. 22 CIV. 6549 (PAE), 2023 WL 2859160, at \*12 (S.D.N.Y. Apr. 10, 2023); *Mrinalini, Inc. v. Valentino S.p.A.*, No. 1:22-CV-2453 (MKV), 2023 WL 2307479, at \*5 (S.D.N.Y. Mar. 1, 2023), reconsideration denied, No. 1:22-CV-2453 (MKV), 2023 WL 3847292 (S.D.N.Y. June 6, 2023).

There are sound reasons for granting a stay versus dismissal.  "[A] stay, as opposed to a dismissal is consistent with the FAA's underlying policy 'to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible.'"  *Yost*, 2023 WL 2859160, at \*11 (S.D.N.Y. Apr. 10, 2023) (quoting *Katz*, 794 F.3d at 346).  Conversely, a "dismissal would allow [a litigant] to 'appeal at once, and thereby delay the arbitration, with

associated costs and uncertainties.'" *Monk*, 2023 WL 22618, at *7 (quoting *Bissonnette*, 49 F.4th at 664 (Jacobs, J., concurring)); *see also EX.CO Tehnologies Ltd.*, 2023 WL 5035175, at *3 ("The Court heeds the guidance from the Second Circuit that 'courts should stay litigation pending arbitration to avoid converting an otherwise unappealable interlocutory stay order into an appealable final dismissal order, thus enabling parties to proceed to arbitration directly.'" (quoting *Dylan 140 LLC v. Figueroa*, 982 F.3d 851, 859 n.2 (2d Cir. 2020)).  Accordingly, Bloomberg's motion to dismiss this matter rather than stay it pending the resolution of arbitration proceedings is denied.

## V.    <u>Conclusion</u>

Bloomberg's motion is GRANTED IN PART and DENIED IN PART.  Graham shall participate in arbitration pursuant to the terms of the Arbitration Agreement.  Bloomberg's motion to dismiss is DENIED.  This case is hereby STAYED pending the outcome of the parties' arbitration.  The parties shall provide the Court with a joint status letter by the earlier of seven days after the outcome of this arbitration or by September 20, 2024.

The Clerk of Court is respectfully directed to close the motion at Doc. 8.

SO ORDERED.

Dated: September 15, 2023
      New York, New York

Vernon S. Broderick
United States District Judge